United States Court of Appeals,

Fifth Circuit.

No. 96-50146.

SAM L. MAJORS JEWELERS, Plaintiff-Appellant,

v.

ABX, INC., doing business as Airborne Express;  Airborne Freight Corporation;  ABX Air Incorporated, Defendants-Appellees.

July 30, 1997.

Appeal from the United States District Court for the Western District of Texas.

Before KING, JOLLY and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Sam L. Majors Jewelers ("Jewelers") sued ABX Air, Inc. d/b/a Airborne Express ("Airborne") for the value of three packages containing jewelry that were lost after being entrusted for shipping to Airborne.  The important and difficult question in this case is whether there is a basis for federal jurisdiction, the monetary amount at issue being insufficient to raise diversity jurisdiction.  We hold that Jewelers' claim raises federal question jurisdiction based on the federal common law that controls an action seeking to recover damages against an airline for lost or damaged shipments.  We further hold that Airborne is not liable for the value of the lost packages because the airbills used in shipping restricted its liability.  We therefore affirm the decision of the district court granting Airborne's motion for summary judgment.

I

This case arises from three transactions between Jewelers and Airborne, which occurred in the spring of 1995.  On each occasion, Jewelers contracted with Airborne to transport packages from Texas to New York. The contents of these shipments were:

Shipment # 1: gold Rolex watch (declared value $3500)

Shipment # 2: special design necklace, 2.2 carat loose diamond (declared value $6000)

Shipment # 3: enamel earrings (declared value $3000).

Jewelers completed an airbill for each shipment, indicating that the packages contained "mdse"

or "merch," presumably intending to identify the contents as merchandise. Jewelers paid an additional fee because of the high declared value of the goods.

On the back of the airbill, Airborne included terms excluding liability for "coins of any kind, currency, furs in any form, gems or stones (cut or uncut), industrial diamonds, or precious metals of any type or form lost during shipping." The airbill also incorporated by reference the Airborne Express Service Guide, which provided that Airborne was not liable for the loss of "jewelry." These service guides were available at Airborne stations, and were sent to customers free of charge on request.

The three shipments were not received by the addressee in New York and Jewelers sued to recover the value of the goods. The district court entered summary judgment in favor of Airborne, and Jewelers appeals.

II

Before reaching the merits, we must decide whether we have jurisdiction to resolve this case. Jewelers filed its original complaint in Texas state court, alleging breach of contract, negligence, and violations of the Texas deceptive trade practice law. Airborne removed the action to the federal district court, asserting that Jewelers' claims against a common carrier, and any corresponding liability on the part of Airborne, were governed by federal law. Jewelers did not contest removal.

In determining whether removal is proper, we begin with the fundamental principal that only actions that originally could have been filed in federal court can be removed to federal court. 28 U.S.C. § 1441, *Caterpillar Inc. v. Williams,* 482 U.S. 386, 390, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987).[1] Absent diversity of citizenship, federal question jurisdiction is required to support removal. *Id.* at 392, 107 S.Ct. at 2429. Because the claims involved here are insufficient to satisfy the minimum monetary requirements for diversity jurisdiction, this case could only be removed

---

[1]28 U.S.C. § 1441(a) provides:

> any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

properly under federal question jurisdiction. Federal jurisdiction exists when a federal question is presented on the face of a plaintiff's properly pleaded complaint. *Id.* at 392, 107 S.Ct. at 2429. The existence of a defense based upon federal law is insufficient to support jurisdiction. *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8-12, 103 S.Ct. 2841, 2845-47.

There are three theories that might support federal question jurisdiction in a case such as this one. First, jurisdiction may be found when the complaint raises an express or implied cause of action that exists under a federal statute. Second, jurisdiction will lie if an area of law is completely preempted by the federal regulatory regime. Finally, if the cause of action arises under federal common law principles, jurisdiction may be asserted.[2]

### A

Suits arising under a federal statute plainly come within the jurisdiction of the federal courts. Although the airline industry was regulated throughout most of its history, in 1978 Congress substantially deregulated the industry. Under the new, limited regulatory regime, there is no express private right of action to recover the value of damaged or lost cargo. We also find no indication that Congress implicitly intended a private right of action to arise under the statutory scheme.[3] We

---

[2]Airborne advances an additional theory: it maintains that federal jurisdiction was created when Jewelers amended its complaint to include the following sentence: "This Court has jurisdiction through the laws of the United States regulating commerce, specifically 49 U.S.C. § 11707, et seq." We summarily dismiss this contention.

> Section 11707 is a jurisdictional statute directed toward ground transportation. At oral argument, neither party maintained that Section 11707 as being applicable to this case; it is not applicable.

[3]In *Cort v. Ash,* the Supreme Court held that a private cause of action is implicit in a statute when: (1) the statute creates a federal right in the plaintiff's favor; (2) there is an indication of a legislative intent to create a private remedy; (3) a private remedy would be consistent with the statutory scheme; and (4) the cause of action would not lie within an area of traditional state concern, so that it would be inappropriate to infer a cause of action based solely on federal law. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed. 26 (1975).

> There is a sound "presumption that Congress did not intend to create a private right of action." *Louisiana Landmarks Soc., Inc. v. City of New Orleans,* 85 F.3d at 1119, 1123 (5th Cir.1996) (citation and internal quotation marks omitted). The burden of demonstrating that Congress "affirmatively contemplated" private enforcement is "relatively heavy." *Id.; Sigmon v. Southwest Airlines,* 110 F.3d 1200 (5th Cir. 1997). At least one circuit has noted that "[o]f late, courts seldom imply a private right of action" because of the strong presumption against their creation. *Statland v. American Airlines,*

therefore turn to consider whether jurisdiction is supported by federal preemption.

The Airline Deregulation Act of 1978, 92 Stat. 1705, (the "ADA") contains a preemption clause that preempts any state law relating to the rates, routes or services of air carriers. 49 U.S.C. § 41713(b)(4)(A). This preemption clause, standing alone, does not give rise to federal jurisdiction, however. As the Court in *Caterpillar* noted:

> It is now well settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.

*Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430 (citing *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 12, 103 S.Ct. 2841, 2847).

Although a preemption defense will not support jurisdiction, in exceptional circumstances courts may find that a federal regulatory regime is so extensive and comprehensive that it is possible to infer that Congress intended any related cause of action to be governed under federal law. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64, 107 S.Ct. 1542, 1546-47, 95 L.Ed.2d 55 (1987); *Aaron v. National Union Fire Ins. Co. of Pittsburg,* 876 F.2d 1157 (5th Cir.1989)(discussing at length the complete preemption doctrine).

This "complete preemption" occurs only when Congress intends not merely to preempt a certain amount of state law, but also intends to transfer jurisdiction of the subject matter from state to federal courts. *See Metropolitan Life,* 481 U.S. at 65-66, 107 S.Ct. at 1547-48. Unless Congress clearly manifests an intention to transfer jurisdiction to federal courts, there is no basis for invoking federal judicial power. *See Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189-90, 55 L.Ed.2d 443 (1978); *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1420 (5th Cir.), *cert. denied,* 510 U.S. 824, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993).

We agree with the Sixth Circuit's conclusion that Congress did not intend to completely preempt state law:

Examining the text of the ADA and its legislative history, we see no evidence that Congress

---

*Inc.,* 998 F.2d 539, 540, *cert. denied* 510 U.S. 1012, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993); *West Allis Memorial Hospital, Inc. v. Bowen,* 852 F.2d 251, 254 (7th Cir.1988).

intended the federal courts to have exclusive subject matter jurisdiction over the preemption defenses to state law claims against air carriers. Quite to the contrary: if the Supreme Court was correct to state that the ADA, unlike ERISA, did not intend to "channel actions into federal court," *American Airlines [v. Wolens,* 513 U.S. 219, 230, 115 S.Ct. 817, 825, 130 L.Ed.2d 715 (1995) ], then only a state court, or a federal court sitting in diversity, is an appropriate forum for resolution of [the plaintiff's fraud] claims.

*Musson Theatrical, Inc.,* 89 F.3d at 1253.

Because Jewelers' action does not arise under a federal statute and because jurisdiction is not supported by complete preemption, we must determine whether Jewelers' claim arises under federal common law.

B

(1)

Federal jurisdiction exists if the claims in this case arise under federal common law. *Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972)(noting "[w]e see no reason not to give "laws' its natural meaning, and therefore conclude that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin."); *see also, National Farmers Union Ins. Co. v. Crow Tribe,* 471 U.S. 845, 850, 105 S.Ct. 2447, 2450, 85 L.Ed.2d 818 (1972). We must, therefore, determine whether a cause of action against air carriers for lost or damaged goods arises under federal common law. We begin our analysis by tracing the history of federal regulation of air carriers.

Before federal statutory regulation, the liability of common carriers was dictated by federal and state common law.[4] The Carmack Amendment to the Interstate Commerce Act of February 4, 1887, the first comprehensive statutes governing ground transportation by common carriers, specified that federal law, controlled liability for goods lost or damaged during interstate shipments.[5] In *Adams Express Co. v. Croninger,* 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913), the Supreme Court

---

[4]*See, e.g., York Co. v. Central R.R.,* 70 U.S. 107, 18 L.Ed. 170, 3 Wall. 107 (1865), *Hart v. Pennsylvania R.R. Co.,* 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884).

[5]The law provided that any interstate railroad "receiving property for transportation ... shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it ..., and no contract, receipt, rule, or regulation shall exempt such ... railroad ... from the liability hereby imposed." 34 Stat. 595, 49 U.S.C. § 20(11), 49 U.S.C.A. § 20(11).

declared that *via* the Carmack Amendment, Congress had totally preempted state regulation of the liability of common carriers. *Id.* at 505, 33 S.Ct. at 155 (noting "the national law is paramount and supersedes all state laws as to the rights and liabilities" of carriers).

With the development and advancement of air transportation, federal regulation was expanded to include air carriers. The first comprehensive federal aviation act was adopted in June 1938. *See* The Civil Aeronautics Act, 52 Stat. 973.[6] The Civil Aeronautics Act created the Civil Aeronautics Authority, the precursor to the Civil Aeronautics Board, which had among its powers the authority to investigate accidents and recommend safety measures.

In addition to establishing a regulatory board to oversee air safety, the Act also contained a clause that preserved remedies "now existing at common law or by statute...." 52 Stat. 1027.[7] Because this statute was enacted only two months after the Supreme Court ruled in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) that there is "no federal general common law," the significance of the savings clause as it relates to *federal* common law is not immediately apparent. Had *Erie* eliminated all common law, one would assume that the savings provision only preserved state common law actions. *Erie,* however, applied only to the *general* common law. The Supreme Court has made it clear that notwithstanding *Erie,* federal common law causes of action continue to exist when a federal rule of decision is "necessary to protect uniquely federal interests." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964).[8] Moreover, federal common law also may arise when Congress has given the

---

[6]The Civil Aeronautics Act replaced a patchwork of statutes that provided limited federal regulation of the air carrier industry. *See* Airmail Act of 1925, Pub.L. No. 68-359, ch. 128, 43 Stat. 805 (1925); Airmail Act of 1930, Pub.L. No. 71-178, ch. 223, 46 Stat. 259 (1930), Airmail Act of 1934, Pub.L. No. 74-270, ch. 530, 49 Stat. 614 (1934); The Air Commerce Act of 1926, Pub.L. No. 69-254, ch. 344, 44 Stat. 568 (1926).

[7]In 1958, a more comprehensive regulatory regime was adopted. *See* The Federal Aviation Act, Pub.L. 85-726, 72 Stat. 731. This Act also contained a clause that preserves existing common law remedies. *See,* 52 Stat. 1027, 49 U.S.C.App. § 1506.

[8]As has been frequently noted, the same day *Erie* was decided, the Supreme Court released an opinion in which Justice Brandeis, the author of *Erie,* relied upon federal common law to resolve a case. *See Banco Nacional,* 376 U.S. at 426, 84 S.Ct. at 939 (noting that "[i]n *Hinderlider v. La Plata River Co.,* 304 U.S. 92, 110, 58 S.Ct. 803, 811, 82 L.Ed. 1202, in an opinion handed down the same day as *Erie* and by the same author, Mr. Justice Brandeis, the Court declared, "For

courts the power to develop substantive law. *See Wheeldin v. Wheeler,* 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); *See also, Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 642, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). It is therefore arguable—perhaps probable—that a federal common law cause of action, narrowly confined to claims similar to the claim before us today, was preserved by the Civil Aeronautics Act's savings provision; this is especially true when considered against the historical backdrop of federal law—both common law and statutory law—which asserted complete control over similar claims arising out of interstate ground transportation. Still, we have found no cases either recognizing or denying the continued existence of a federal cause of action against air carriers under the savings clause of the 1938 Act.[9] In any event, whether the federal common law was preserved by the Civil Aeronautics Act is ultimately not relevant to the current status of the federal common law as it relates to our case today. This is true because after this period a federal common law did develop and was saved by subsequent acts of Congress.

---

whether the water of an interstate stream must be apportioned between the two States is a question of "federal common law" upon which neither the statutes nor the decisions of either State can be conclusive.' ")

[9]In *Musson,* the court emphasized the absence of federal common law action under the Civil Aeronautics Act:

> In 1938, Congress passed the Civil Aeronautics Act, 52 Stat. 973, which set up a system of tariffs for air carriers. The Act contained a savings clause stating that nothing in the Act would "in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C.App. § 1506. As a result, certain state common law actions remained possible throughout the period when the Civil Aeronautics Act was operative.
>
> Musson, however, has failed to present one example of a federal common law cause of action against air carriers during this period. We do not find this absence of precedent surprising in light of the teaching of *Erie.*

*Musson,* 89 F.3d at 1250.

Nonetheless, the court in *Musson* recognized that federal common law rules govern at least some aspects of actions against air carriers for lost goods. *Id.* at 1249 (recognizing that "a federal common law rule allows air carriers to limit by contract their liability for losses.").

The Federal Aviation Act of 1959 was the next major act regulating air transportation.[10] It was similar in many ways to the other major interstate commerce acts (such as the Interstate Commerce Act, the Federal Communications Act, and the Motor Carriers Act). Each Act:

> (1) required carriers to file tariffs listing all terms for their rates, services, practices, rules, conditions, etc.;

> (2) prohibited carriers from charging or collecting rates or providing services which varied from their tariffs, and from providing discriminatory rebates or refunds;

> (3) authorized the relevant administrative agencies to suspend unjust, unreasonable, discriminatory, or predatory terms in carriers' tariffs and to proscribe terms in their stead; [and]

> (4) provided administrative and criminal penalties for violation.

*See Roberts Distributor, Inc. v. Federal Express Corp.,* 917 F.Supp. 630, 634 (S.D.Ind.1996). Significantly, the other major interstate commerce acts included a provision that imposed liability on carriers for loss or injury to goods transported and provided for private civil actions to recover. The Federal Aviation Act, however, failed to include such a provision. Nonetheless, applying federal common law, federal courts found that civil actions against air carriers for lost or damaged goods arose under federal law.[11]

Illustrative of such cases is *North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229. In *Phillips,* a shipment of goods was hijacked, and the shipper sued the air carrier to recover the value of the stolen items. The court held that "[l]imitations of liability and cargo valuations are inherent parts of the [federally regulated air] rates, and the statutory mandate of uniformity must therefore apply to the liabilities which attend the carriage of goods." *Id.* at 232. The court reasoned that if each state imposed its own liability rules, the "statutory mandate of uniformity" would be violated. Therefore, the court concluded that "[a]lthough the liability of air carriers [for lost

---

[10]This act also contained a savings clause preserving remedies existing at common law. *See* 49 U.S.C.App. § 1506.

[11]*See, e.g., North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229 (2d Cir.1978); *Klicker v. Northwest Airlines, Inc.,* 563 F.2d 1310, 1312-16 & n. 10 (9th Cir.1977); *Tishman & Lipp, Inc. v. Delta Air Lines,* 413 F.2d 1401, 1403 (2d Cir.1969), *Lichten v. Eastern Airlines,* 189 F.2d 939, 941 (2d Cir.1951); *See also, First Pennsylvania Bank v. Eastern Airlines,* 731 F.2d 1113 (3d Cir.1984); *Deiro v. American Airlines, Inc.,* 816 F.2d 1360, 1365 (9th Cir.1987).

goods] is not created by statute, as is the case with surface carriers" such claims necessarily arise under federal law: "The allegations of appellant's complaint show that its claim is based upon the loss of goods during interstate transportation by appellee as a common carrier for hire. From the substance of these allegations, it is clear that the complaint sets forth a claim arising under federal law." *Id.* at 234.

Other cases in the regulatory era applied different reasoning to reach the same conclusion: federal common law governed the liability of air carriers for lost or damaged goods.[12] Therefore, prior to deregulation, private civil suits against air carriers for lost or damaged goods arose under federal common law that either survived *Erie* or was developed after *Erie* to serve a particular federal interest.

(2)

In the 1970's, Congress began to deregulate the airline industry. This deregulation process culminated with the Airline Deregulation Act of 1978, which deregulated most aspects of domestic air transportation. Thus, we must determine whether federal common law causes of action against air carrier have survived deregulation.

The Supreme Court has recognized that "[i]t is a well-established principle of statutory construction that [t]he [federal] common law ... ought not to be deemed to be repealed, unless language of a statute be clear and explicit for this purposes." *Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 35, 104 S.Ct. 304, 307, 78 L.Ed.2d 29 (1983). When Congress has expressly preserved a remedy arising under federal common law our mandate is even more clear, and only by continuing to recognize the cause of action may we effectuate congressional intent. *See In re Complaint of Oswego Barge Corp.,* 664 F.2d 327, 339 (2d Cir.1981)(noting that "any terms of [a] statute preserving or preempting judge-made law are of course controlling...."); *Resolution Trust Corp. v. Cityfed Financial Corp.,* 57 F.3d 1231 (3d Cir.1995)(same). When deregulating the airlines under the ADA, not only did Congress chose not to repeal federal common

---

[12]*See, e.g., Klicker,* 563 F.2d at 1312-16 & n. 10; *Tishman & Lipp,* 413 F.2d at 1403; *Lichten,* 189 F.2d at 941.

law in "clear" and "explicit" language, it chose the opposite course:  the ADA includes an express provision preserving common law remedies.  In enacting the ADA, Congress included a savings clause that provided:

> Nothing in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Chapter are in addition to such remedies.

49 U.S.C.App. § 1506.[13]

This savings clause had the effect of preserving the clearly established federal common law cause of action against air carriers for lost shipments.  Although it has been argued that because the airline industry has been substantially deregulated, the rationale for applying a federal common law cause of action no longer exists, Congress has foreclosed this argument by including a provision in the ADA preserving federal common law actions.[14]  Therefore, a federal cause of action continues to survive for freight claims against air carriers.

(3)

We are not the first circuit to reach this conclusion.  In *First Pennsylvania Bank v. Eastern Airlines,* 731 F.2d 1113 (3d Cir.1984), the Third Circuit reached the same conclusion, although using somewhat different reasoning.  In *First Pennsylvania Bank,* a shipper sued an air carrier after the carrier lost a valuable cargo.  The Third Circuit noted that prior to statutory regulation, federal common law doctrine governed suits against common carriers that lost cargo.  The court also recognized that both the Federal Aviation Act and the Civil Aeronautics Act contained a savings provision preserving "the remedies now existing at common law or by statute...."  29 U.S.C. § 1506 (1976).  Therefore, the court concluded that prior to deregulation, federal common law controlled any action against air carriers for lost goods.  The court also concluded that deregulation did not affect this legal principle.  Deregulation eliminated the air carrier's obligation to file tariffs, and

---

[13]This provision was re-enacted without substantive change as 49 U.S.C. § 40120(c).

[14]*Erie*'s abolition of "general" federal common law is often recognized as preserving the separation of powers between Congress and the courts.  *See, e.g.,* George D. Brown, *Symposium: Federal Common Law and the Role of the Federal Courts in Private Law Adjudication—A (New) Erie Problem,* 12 Pace L.Rev. 229 (1992).  By enacting the ADA's preemption clause, however, Congress has placed a statutory imprimatur upon federal common law in the limited circumstance of this case.

eliminated the Civil Aeronautic Board's power to prescribe and determine the reasonableness *vel non* of the air carrier's rates, rules, and practices. Nonetheless, deregulation left the resolution of claims for lost goods a "purely judicial question for determination by the application of the federal common law...." *Id.* at 1122. This reasoning has been adopted by other courts. *See, e.g., Deiro,* 816 F.2d at 1365 (noting that the "federal common law applicable to carriers was not changed with the advent of regulation of air carriers" and "the subsequent deregulation of air carriers in 1978 did not change the applicability or substantive content of the relevant federal common law.").[15]

Because Jewelers' negligence action against Airborne arises under federal common law, we have jurisdiction over this action.[16] We therefore consider the merits of the appeal.

### III

The district court granted Airborne's motion for summary judgment, holding that Airborne effectively had limited its liability by including on its standard airbill provisions that hold the shipper harmless for any lost jewelry. We agree. In transactions involving air carriers, the airbill serves as a contract for carriage. *See, e.g., Southern Pac. Transp. Co. v. Commercial Metals,* 456 U.S. 336,

---

[15]Our conclusion that Jewelers' cause of action arises under federal common law is not in conflict with *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334 (1995)(en banc). In *Hodges,* we held that the ADA's preemption clause did not preempt all state claims for personal injury. *Hodges* did not address the availability of a federal remedy for goods lost in interstate shipping. Similarly, our holding is not inconsistent with *Wolens,* 513 U.S. at 230, 115 S.Ct. at 825, 130 L.Ed.2d 715. In *Wolens,* the Supreme Court clarified the importance of the ADA's preemption clause, recognizing that the ADA did not "channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airlines rate, routes, or services." *Id.* at 230, 115 S.Ct. at 825. The Court went on to note that the ADA's preemption clause, "read together with the FAA's savings clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonors a term the airline itself stipulated." *Id.* at 232, 115 S.Ct. at 826. This discussion is not inconsistent with our narrow holding that a federal cause of action exists against an interstate air carrier that negligently loses a shipment.

[16]We recognize that the decision we reach today is a difficult one, especially because no Fifth Circuit case had addressed whether a federal common law cause of action was available in these circumstances prior to the enactment of the ADA's savings clause. Our decision in this matter is heavily influence by the policy consideration that circuit splits, especially in the circumstance of this case in which national uniformity of a single rule is of vital importance, are to be avoided. In this respect we emphasize that we only hold that a cause of action against an interstate air carrier for claim for property lost or damaged in shipping arises under federal common law. Because we rely upon the historical availability of this common law remedy, and the statutory preservation of the remedy, our holding today is necessarily limited.

341, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982); *Farmland Indus., Inc. v. Andrews Transport Co.,* 888 F.2d 1066, 1068 (5th Cir.1989), Tex. Bus. & Com.Code Ann. § 1.201(a)(6). The airbill at issue here thus acts as a contract between Jewelers and Airborne.

Carriers are allowed to limit their liability in the contract of carriage. *See, e.g., Carpenter v. Klosters Rederi A/S,* 604 F.2d 11, 13 (5th Cir.1979) (upholding statute of limitations included in contract of passage); *Husman Constr. Co. v. Purolator Courier Corp.,* 832 F.2d 459, 461 (8th Cir.1987) (holding "in the absence of evidence of unconscionability, a carrier may limit its liability for actual damages"); *Deiro,* 816 F.2d at 1365 (holding air passenger bound by clause limiting liability for damaged or lost baggage). The carrier need not demonstrate that the customer had actual knowledge of the liability limitations; instead, "[a]cceptance and use of the ticket suffice[s] to establish an agreement prima facie valid which limit[s] the carrier's liability. Mere failure by the passenger to read the matter plainly placed before her could not overcome the presumption of assent." *Id.* at 1366 (citing *New York C. & H.R.R. Co. v. Beaham,* 242 U.S. 148, 150, 37 S.Ct. 43, 44, 61 L.Ed. 210 (1916)).

The front of the pre-printed airbills that Jewelers used in shipping the packages directed the shipper to the terms and conditions of shipment printed on the back of the form. The back of the form provided: "[w]hen you give us your shipment to deliver, you agree to all the terms in this non-negotiable airbill, and in our current tariffs and service guide which are available upon request." Under the heading "unacceptable goods" the airbill provided:

> We will not accept the following articles for transportation: (a) coins of any kind, currency, furs in any form, gems or stones (cut or uncut), industrial diamonds, or precious metals of any type or form;

> * * * * *

> We will not be responsible for any loss, damage, delay, liability, or penalties resulting from transportation of such articles, however described or misdescribed on the air bill.

The service guide that is incorporated by the airbill provides that "jewelry" may not be shipped.

If given legal force, these provisions bar recovery for the loss of the goods shipped by Jewelers. Jewelers contends, however, that it did not have sufficient notice of these terms. Therefore, before Jewelers will be bound by the airbill we must determine whether the liability limiting

provisions were sufficiently plain and conspicuous to give reaso nable notice of their meaning. A two-step analysis is used to make this determination. *See Deiro,* 816 F.2d at 1364. First, the physical characteristics of the airbill are to be examined to determine whether they provide reasonable notice to the customer. Here, the airbill contained a conspicuous notice on the front directing the customer to the terms and conditions printed on the reverse of the document. This provision provided adequate notice of the easily understood terms on the reverse side. In addition, the back of the notice incorporated by reference a service guide that was readily available, and written in plain language.

The second factor to consider is the conditions under which the shipment was made. The conditions to be considered include the customers "familiarity with the ticket, the time and incentive under the circumstances to study the provisions of the ticket, and any other notice that the passenger received outside of the ticket." *Id.* This factor weighs heavily in favor of Airborne, because Jewelers, as an experienced shipper, had ample opportunity to inspect the airbill; Jewelers admits to having used air shipping on a daily basis for over ten years. The prohibition against shipping gems, stones, and precious metals gave Jewelers ample incentive to request an Airborne Service Guide. This service guide expressly pro vided that "jewelry" was unacceptable for shipping, and that Airborne would not be responsible for their loss.[17] Jewelers is bound by these liability limiting provisions.[18]

---

[17]Jewelers contends that the airbill gave no notice, whatsoever, that jewelry was an unacceptable item for shipping. Although the express prohibition against shipping jewelry only appears in the service guide, this guide was incorporated by reference into the airbill. An airbill may incorporate by reference outside materials in limiting liability. *See, e.g., Deiro,* 816 F.2d 1360 (recognizing enforceable limitation on liability through combination of statements on air ticket and incorporated service guide); *Hopper Furs, Inc. v. Emery Air Freight Corp.,* 749 F.2d 1261 (8th Cir.1984) (finding enforceable contract limiting liability was created by virtue of terms printed on airbill and service guide incorporated by reference). Because it is an experienced shipper, and because the airbill contained express prohibition against shipping certain types of jewelry, we have no trouble concluding that Jewelers has sufficient notice of the prohibition. We express no opinion whether this prohibition would effectively limit liability in other circumstances.

[18]Jewelers also argues that Airborne waived these liability limiting provisions by accepting the jewelry for shipping. Jewelers failed to identify on the airbill that the goods being shipped were jewelry. Instead, they were labeled as containing merchandise. In any event, the airbill expressly provides that Airborne is not liable for prohibited items, regardless of how they are described in the airbill. Although the airbill identified the shipper as a jewelry store, there is record evidence that jewelry stores routinely ship acceptable goods *via* Airborne. Therefore, the evidence does not support the conclusion that Airborne waived the liability restrictions by accepting the packages for shipping.

We therefore hold that the provisions included on Airborne's airbill effectively limited its liability for the goods shipped by Jewelers, and thus, Jewelers may not recover for its loss.

IV

Jewelers also asserts a claim for violations of the Texas Deceptive Trade Practice-Consumer Protection Act. This point of appeal is without merit in the light of *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715.  In *Wolens,* the plaintiffs filed a state court class action against an airline, alleging breach of contract and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. The Supreme Court held that the cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act was preempted by the Airline Deregulation Act. *Wolens,* 513 U.S. at 226-27, 115 S.Ct. at 823-24.  Specifically, the Court held that "the ADA's preemption prescription bars state-imposed regulation of air carriers...." *Id.* at 220, 115 S.Ct. at 820. The Court reasoned that although state courts may "give effect to bargains offered by the airlines and accepted by airline customers," the ADA's preemption clause "read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services." *Id.* at 226 & 232, 115 S.Ct. at 823 & 826.

*Wolens* leaves no doubt that the Texas Deceptive Trade Practice-Consumer Protection Act is preempted by the ADA, especially as it relates to an airline's rates, routes or services.  If given effect in this case, the Texas act would impose its substantive standards on service provided by an air carrier—a result not permitted by the ADA. Therefore, Jewelers' claim under the Texas act is barred as a matter of law.

V

In conclusion, we hold that because this cause of action arose under federal common law, we have jurisdiction.  We also hold that the liability limiting provisions of the airbill bar Jewelers from recovering for the lost goods and that Jewelers' claim under the Texas Deceptive Trade Practice-Consumer Protection Act is preempted.  The judgment of the district court is therefore

AFFIRMED.